All right, if you're ready to proceed, you may do so. Good morning, and may it please the court. My name is Todd Thibodeau, and I'm here with co-counsel Robert Sheehan. We represent the plaintiff and appellant, Lois Goodman, who is also here. And your timing, we need to... Are you gonna do 10 minutes? I'm gonna do 10, yes, Your Honor. And then five. Okay, you have that. Great, go ahead. Sorry, I didn't mean to take your time. And Mrs. Goodman is here in the courtroom with us, Your Honor. Let's see, your name is what? It's Thibodeau, Your Honor. Thibodeau? Yes. You're the first Thibodeau I've ever met. I'm happy to be the first Thibodeau you've ever met, Your Honor. Okay. Your Honors, the defendant detectives in this case arrested a 70 year old grandmother because they didn't think she was sufficiently emotional when her husband died, and because, her makeup was not running. That's a quote from their follow up investigation report. Her makeup was not running? Her makeup was not running. A 70 year old grandmother is a child to me. Yes. Her makeup was not running as a quote from the report that they provided to the district attorney when they sought the arrest warrant. And it can't be disputed really at this point that Mrs. Goodman did not murder Mr. Goodman. And in fact, that Mr. Goodman's death was an accident. And the reason it can't be disputed is because there was no DNA evidence. In fact, all the DNA evidence pointed to an accident. Mrs. Goodman passed the polygraph test. Both prosecution experts, the two experts hired by the district attorney, concluded, flatly concluded, unambiguously concluded, that Mr. Goodman's death was an accident. The district attorney sent this case to its storage archives within weeks of closing it. Can you talk right into that? Yes, Your Honor. Even before the DNA evidence absolutely ruled out the notion that Lois Goodman killed Alan Goodman, the totality of the facts and the circumstances known to the defendants ruled out any objectively reasonable basis for believing that a crime was committed or that Lois Goodman committed any crime. So, I mean, it seems like... Let me ask you, do you agree or disagree that the facts underlying your claims against the LAPD defendants are largely undisputed? I disagree in the sense that the LAPD defendants dispute a lot of what Mrs. Goodman's facts are, and Mrs. Goodman certainly disputes all of the facts and circumstances on which they base their claim that there was probable cause. It seems to me that you're arguing that the inferences that the officers drew from the totality of the circumstances surrounding Mr. Goodman's death were clearly erroneous. Is that your position? The inferences were unreasonable, the inferences that they drew. The facts that they concluded are in dispute. For example, one of the facts they mentioned in their determination that there was probable cause was that her makeup was not running. That's disputed. We dispute that Mrs. Goodman was even wearing makeup on the day that she umpired nine college tennis matches under the Woodland Hills sun that afternoon. We dispute another one of the facts that they say make up the circumstances that led them to believe there's probable cause. We dispute that she wasn't emotional or that she was cold. A number of the witnesses said she was sobbing or crying or in shock. So those those facts are disputed. There's no physical evidence. There was zero physical evidence that tied Mrs. Goodman to any crime or showed that any crime was committed. The most important thing was there was no blood spatter, which absolutely would have been. But they found all this out later with experts. It doesn't take a lot to meet probable cause requirement. Uh, they did not find that out. They knew that that very evening, Your Honor, because Detective Petit called Detective McCarty, who was at the house, and he asked him about was there was their who actually showed up that night was a trained homicide detective. He knew about he knew what blood spatter was. He knew it was important. He knew why it was important, and he looked for it. And all of the officers at the house that evening, Your Honor, looked for blood spatter. And on that evening, they found no blood spatter. The photos that they took showed no blood spatter, so they didn't find out later. They knew right away that there was no blood spatter. So you're highlighting some of the things that are I'm sorry. Pardon me. There could not. There absolutely could not have been a murder in the way shot. Yeah, especially under the defendant's theory in this case that Mrs Goodman shattered a mug against her husband's head, causing him to bleed and then absolutely going to be blood spatter. And we know that the defendants knew that because they looked for it. They asked every officer who was there was their blood spatter, and they were told no. They sent out the criminalists two or three times to the Goodman house, and they swabbed every single wall. And this is early in May within weeks looking for blood spatter. So they knew it was important. They knew it absolutely should have been there, and they spent a lot of time looking for it. And there was no blood spatter. There Mrs Goodman's fingerprints on the mug and the part of the mug that they claim in their in their theory that Mrs Goodman used to hit Mr Goodman with had no blood on it. There was a I mean, you're folk. There are, though, some facts here that are undisputed. Correct. I mean, you're you're highlighting some that are disputed, but there are some that are undisputed. Correct. I think it's undisputed that Mr and Mrs Goodman were married for 50 years. Well, it's undisputed that the initial responders to Goodman's 911 call believed the scene surrounding Alan's body was suspicious. That's disputed, Your Honor. I mean, none of the none of the first responders thought none of the first responders. They saw that there was a lot of blood is what they saw. Well, it was surprisingly deep laceration, um, to Mr Mr Goodman's face, including almost completely severed ear. Do you dispute that? I dispute that the first responders saw that. Well, the initial coroner's examination revealed that that's disputed, Your Honor. And the reason that's disputed is because we know later that that these lacerations weren't that deep, that they were all superficial. So that is disputed. We don't dispute that he said that. I mean, we have no way of disputing that he said that. But it's is there any broken bones? Do you dispute that there were any broken bones? There were no broken bones. Okay. Um, that the that this type of injury would be inconsistent with the fall? No, Your Honor. No, that's disputed. And in fact, Dr Wong says when we pointed out that Dr Wong omitted any mention that he had injuries consistent with an accidental fall, Dr Wong said, Well, if he was hit with a mug, he would have fallen anyway. So even Dr Wong, Dr Wong ultimate opinion is that his death was a homicide. Do you dispute that? I can't dispute the Dr Wong wrote in the in the report homicide after four months. No, I can't dispute that. You can't dispute that. I know you dispute, you know, that there was any basis for right. But from the police perspective, if they get a assessment of homicide from Dr Wong, I'm just trying to figure out that seems in the bar is so low on probable cause. I'm just trying to figure out how that the police department can be held accountable. Well, again, we have to look at the all the circumstances that are present behind that determination of Dr Wong's determination of homicide. He made that you're talking about. Yes, he made that determination a month after he recorded meetings with the LAPD defendants after months of them telling him falsely that the D. A. Is waiting that he needs to close the case. There was a lot of pressure on Dr Wong. Dr Wong provided no explanation for why there was a homicide. But D. A.'s expert says clearly not a homicide. Nothing quote unquote nothing supported the notion of a homicide. So I can't dispute that Dr Wong ultimately wrote homicide. But what we can point and that's what the police have relied on. The police didn't rely on that, Your Honor, because in the in the August 14th follow up investigation report, the police wrote Dr Wong is going to conclude that this is a homicide, which corresponds to our conclusion as well. So in other words, what would have happened if Dr Wong had said, Um, it's undetermined. I can't determine whether it was a homicide or not a homicide. LAPD defendants had already determined it was a homicide. They could have gone on and pursued the case. The only way they couldn't have pursued the case or would have been very difficult for them to pursue the case is if Dr Wong had said no, this was an accident, then it would have been difficult. But he was while he was very helpful to them, he wasn't an absolutely essential part and and his failure to determine homicide didn't preclude them from going forward and treating this is a homicide. And it didn't even factor into their determination that it was a homicide because they said themselves they had already determined that it was a homicide. So I don't think the LAPD think you're at your five minute mark into your person, Your Honor. I just like to close by saying that that the LAPD will buzz. That was the time here on. I'd like to conclude by saying here that the district court applied an analysis that none of the defendants advocated and he applied it. The district court applied that analysis in a way that no other court has ever applied it by by applying this judicial deception analysis to a multi volume murder book. What's your claim against the claim against the coroner is for false arrest and malicious prosecution. State, state and federal. You're talking about the court. Yes, Your Honor. How would you sum that up? The corner. There's a disputed fact. There's evidence from which a reasonable jury could find that the corners failure to include the two most important issues in his corner report, absence of defensive injuries and presence of injuries that support an accidental fall and his failure is fair to explain or justify or analyze his changing of his opinion from pending investigation of homicide give rise to some inference that he was reckless. He recklessly disregarded disregarded the truth in reaching those conclusions. Your Honor, we we think I've had cases where there were three corners from different counties way back. Every one of them had a different opinion. Your Honor, we think Mrs Goodman deserves her day in court. We think there were disputed facts. We think the court applied the wrong analysis here and we think she deserves her day in court. And we asked this court to reverse the district court's decision. Thank you. Thank you. Mr Sheehan. Is that you? Oh, you're gonna do rebuttal. I'm sorry. Okay, go ahead. Good morning, Your Honor's Lisa Berger, deputy city attorney for the city defendants. Mrs Goodman has expressly stated that she doesn't believe her rights were violated by the investigation only by the arrest. And she has expressly stated that she's not claiming there was judicial deception in obtaining the warrant. So essentially, this case is now narrowed down to whether or not there was any reasonable law enforcement officer could have believed there was probable cause to believe there had been a homicide and that Mrs Goodman was involved. Now, what we have here is a case with very unique facts. And to this day, nobody has come up with a plausible theory of what happened that explains all of the evidence. Mrs Goodman's counsel relies a lot on one particular line from one particular report. Can you pull that down a little bit? Yes, sir. Speak up. Um, when you look at all of the experts, put forward the whole thing. Yeah, there you go. I'm not used to being on TV. Um, there were multiple experts that reached multiple different conclusions. But even if you look at the ones on which Mrs Goodman relies, for example, Mr Bevel, in order to explain the blood on the first floor speculated, maybe Mr Goodman had a completely unrelated nose bleed that day, and nobody has been able to explain why he was found lying neatly on a towel that had been laid on the bed. There are multiple interpretations of the evidence. And unless no reasonable law enforcement officer, let's let's focus because assume it's reasonable for the LAPD to conclude that Mr Goodman's death was a homicide. The thin. Um, so what's your best argument as to why there was probable cost to arrest specifically Mrs Goodman? Mrs Goodman was the last person to be with Mr Goodman. There was no evidence that anybody had entered the townhouse. Is that enough? There was also evidence of motive and that nobody else. What's the motive evidence? There was evidence that over the course of at least four years that she had not been taking as good care of her husband as she should have been. There was the adult protective services report made by the V. A. Doctor four years prior to the death. There were multiple notes in the records of how he was unable to self medicate when she would go away for didn't read the pill bottles. There was the incident when she had to call 911 because he gave himself insulin because he misunderstood when he should and shouldn't give himself insulin. Why is that? Why is the 911 call on the insulin attributable to her? It's only an indication that, in fact, despite her, um, disavowal that he was not able to take care of himself. And when she would go for away for weeks at a time without, you know, maybe somebody would come in and, you know, pop in and visit him somewhat like I have someone do for my cats when I go out of town. Um, and may have been doing that for her cats as well, that it was not sufficient. There were indications that she had on more than a few occasions complained that he called her all the time, that it was interfering essentially with her ability to to go out and do things because he didn't want to go out anymore. There were, there was an indication from the estranged daughter that she would not be at all surprised if something untoward had happened. Yes, it was entirely circumstantial. Yes, it was a lot of little different facts. But as Judge Preggerson pointed out, probable cause is a fairly low bar. And to overcome summary judgment and particularly qualified immunity, Mrs. Goodman needed to show that no reasonable law officer could have looked at this circumstantial evidence, looked at the facts of the case and concluded that this was a homicide and that Mrs. Goodman was involved. Once the case is filed, further investigation may or may not have revealed more evidence of her involvement, but certainly the claim that she was completely exonerated because the blood on her pants wasn't her husband's and because she passed a polygraph test is putting a lot of weight on even thinner grounds than are claimed the police had. So there's no basis to reverse the summary judgment. The fact that multiple experts reached different conclusions certainly supports the idea that there was probable cause to believe there had been a homicide. So again, unless no reasonable officer could have looked at the circumstances of her being the only one on the scene, her being the only one with access to the house, her having shown signs of just really being tired of being the sole caretaker for her husband and not providing the care that perhaps he needed, all of that was sufficient for reasonable law enforcement officers to believe that she was involved. The fact that other law enforcement officers might not have agreed is not the level of, it's not the standard. In order to overcome particularly qualified immunity, it would have to be shown that no reasonable law enforcement officers could have found it to be sufficient. And you also have the DA who found the evidence regarding her to be sufficient. And of course the arrest warrant. Mrs. Goodman has basically said that she's not claiming judicial deception in obtaining the arrest warrant. So it's just, is the information available to the judge who issued the warrant sufficient on its face? And our only argument against that is that, well, they just used the five books. That there was no separate express labeled affidavit document that set forth all of the evidence that had been gathered during that investigation. And there's no authority to say that that is not a sufficient way of seeking an arrest warrant. And you're not here to talk on behalf of Dr. Wang? No, your Honor. Good morning, your Honors. Alana Rotter on behalf of the Coroner's Office. As Judge Pegerson said a few minutes ago, there are a lot of cases where we have three coroners and three different opinions. The standard for liability here . . . This isn't one of those. I have some questions regarding . . . What did you say I said? About three coroners? That in a case with three different opinions. I don't know. Yes. The record contains testimony and reports from other experts that have been pretty critical of Dr. Wang's report. Dr. Sheridan, who was retained by the district attorney, testified that he could not see how any examiner could have felt confident in classifying Mr. Goodman's death a homicide, that there were aspects of Dr. Wang's report that appeared to be extremely below the standard for an autopsy. So, keeping in mind our standard here, and that's viewing the evidence the like most favorable to the plaintiffs, how is this not sufficient to at least create a dispute of material factors to whether Dr. Wang prepared his autopsy report with at least a reckless disregard for the accuracy of the report? Well, Dr. Sheridan was mostly focused on this wound in the mouth. That was actually what he said was the only thing that he thought was really beyond the standard of care, and that . . . And he said, as to everything else, without this wound in the mouth, that maybe reasonable coroners could differ, and then he sees it happen, and that everything else is a Dr. Sheridan's opinion really comes down to this mouth wound. Dr. Sheridan's initial report criticized the coroner for not even looking in the mouth and not noting any problem in the mouth. The coroner's report says, there is a 1 by 3 quarter inch hypoemic area in the upper right upper buccal gingival region, which everyone now agrees right upper buccal gingival region is where the gum line connects to the cheek and the mouth. So the coroner's report did actually describe something in the mouth. It appears that Dr. Sheridan missed that in his initial report. At the deposition, Dr. Sheridan is asked about this comment in the report, and he says, I don't think that Dr. Wang was describing what I see. I think he must have been describing something else in the mouth. And so already you have Dr. Sheridan backing off a little bit of the claim that clearly didn't look in the mouth because in the report there's something documented in the mouth. There are also photos that are taken with the autopsy. They show this region in the mouth. Dr. Sheridan says, looks at one photo and says, well I can't say for sure I wasn't there. And I'll read you exactly what Dr. Sheridan says. He says he says something to the effect of, you know, it wasn't, I wasn't there, I don't know for sure, but my impression is he didn't see that thing. So then they say, what was he looking at in the mouth then? And Dr. Sheridan says, well there's another picture in the mouth of a different lesion and he might have been describing that one, but already Sheridan's opinion is much less categorical than it was originally. And Dr. Wang says, looking at the same photo that Dr. Sheridan has shown, when Dr. Sheridan says I can't be sure if that's what he was describing or not, Dr. Wang says, that's what I was describing. Dimensions match what Dr. Wang described. The location matches what Dr. Wang described. And then you've got basically everyone else except for Dr. Sheridan who's looked at this thing says, this is not a traumatic injury, this is a denture irritation. So Dr. Sheridan is putting all this weight, the reason why he thinks this mouth lesion is so critical is because to him it rules out homicide because it shows that because the injury is only inside the mouth and not on the outside lip. That must be what happened is that Mr. Goodman had a coffee mug in his mouth and he fell and the coffee mug scraped the inside of his mouth but not the outside of his mouth and that's how that injury got there. That's why Dr. Sheridan thinks that this mouth thing is so critical. Everyone else says it's a denture irritation. There's a lot of focus though on Dr. Wang here and I guess is there a particular degree of certainty that is required before a homicide? Dr. Wang said that for him it's about 90%. But the standard for especially on qualified immunity, the standard is there is substantial showing that he in fact subjectively didn't believe his conclusion. Not that he was negligent, this is not a negligent standard. So even if Dr. Sheridan had said this report doesn't meet the standards, which again Dr. Sheridan only said missing the mouth lesion doesn't meet the standard, the rest of the report he said maybe reasonable minds could differ without the mouth. But again the standard is subjective belief and it's true that you can infer subjective belief if there are obvious circumstances that would cause you to doubt the veracity. Qualified immunity you need a case that's pretty close on point. The Supreme Court keeps reminding us over and over again on qualified immunity the facts have to match pretty closely to put every on this reckless disregard standard and on the obvious circumstances to doubt the veracity are very far afield from this one. We have the Galbraith opinion which is the only Ninth Circuit opinion on this. That's the case of the 12b6 motion so we're accepting the facts in the complaint as they're alleged. The allegation there is that the coroner in his report says I dissected the neck and based on my review of the organs I find strangulation. The allegation is you exhumed the body and you found that the neck has not been dissected. That sounds pretty reckless because you've got the coroner claiming to have done something and you've got hard physical evidence that there's no possibility the coroner did it. The other case is the coroner says, the medical examiner says, the Lacey case, this is a district court case, the the medical examiner says I very of a wound with my ruler I measured it and I was very careful and I checked and then a week before trial the prosecutor says to the medical examiner you know your wound size doesn't match up with a theory it's gonna make it hard to defend this case or to prosecute this case rather. Look at this photo that's not scaled. Looks to me like it might be small or yeah you've got the size wrong and the medical examiner says okay and testifies at trial that that's what happened. Again those are objectively we know what the facts are we know what happened and it doesn't sound careful or prudent or reasonable or reliable at all. Thank you. I just want to just clear something up. When I talked about you have three coroners you get three different opinions. Now those opinions were on when the death occurred. And some thought it occurred two and a half days before another coroner thought it occurred the night before. Another coroner came up with another time for date of death. And in this case somebody thought one coroner thought natural death due to I knew my time was was limited and I'm sorry about that. But I'll just I'll just if I could just say one thing in conclusion we didn't talk about materiality. I just I sense that the panel is ready to be to be moving on is my only concern. I was just gonna say that the there's also a materiality consideration and I'm not focusing on that but I just want to note in terms of common sense here the standard is it so obvious that he was essentially lying or didn't believe himself. And you've got here the DA saying well more than any of the reports I looked at were the photos. I looked at the photos and it just didn't look like an accident. He had way too many injuries on his head and on his face. They were deep. There was blood all over the house. It was clear to me that he was murdered. This is what the DA is saying. I mean this is a scene where you you've got a coroner on sign-out duty saying in 19 years I've never seen a fall case that looks like this. It just doesn't add up. And the question is is all of that really enough to say it's a substantial showing that Dr. Wong must not have really believed his conclusion. Thank you. I just want to say something as a matter of public health that we're gonna have an epidemic maybe in the next month or two. A flu. And when you're coughing you ought to have a Kleenex. You cough into that. Otherwise when you cough that stuff goes floating all over the place. They be contagious. So that's what you need to do. My wife is a microbiologist and she rehearsed to give you a hell of a better lecture on why your public health risks. You're not careful about that. And particularly for people who are whose immune system may be somewhat compromised and can be fatal. That's why in hospitals we have so many people die there. This is coughing. The doctors don't wash their hands. The nurses forget to do this. People get infected. So you got to think about that. The germ theory of disease is valid. So anybody want any Kleenex? It's a public health good moment there. Thank you very much. I'm vulnerable too. Alright. Do you want to come up for your rebuttal? Anyway it wakes everybody up. It does wake everybody up. Thank you your honors. Thank you for allowing us to split the argument. I had the great honor of being counseled below the state court in this case. What we want to tell the court is that there's no probable cause here. No reasonable officer could have thought there was probable cause. It's just impossible. What we've heard today is that you have a dead body and there's one person in the house and there's some sort of marital background or whatever that that is probable cause at a low bar. It isn't probable cause at a low bar. There's no probable cause. The guy wasn't murdered. She didn't do it. And that's the end of it. Any reasonable officer would have known that. That's what we want to prove. What I want to address very briefly is what I look at as business as usual. With 43 years in this, I may still be a child, but they didn't do it. You're a scary guy. They didn't do it by the book. And when they don't do things by the book, you start to question what's going on. For example, then counsel got a hold of the LAPD. This detective fatigue is pushing Mrs. Goodman around saying we're going to file charges on you. Then counsel says, well, if you want to file charges, we'll bring her down. She went down to the station in Woodland Hills three times on her own. But that wasn't good enough for them when it came time. We have to do business as lawyers. We have to do business with the police. We'll bring the client in. That's not what the LAPD wanted. They had this vendetta going on, this Javert kind of thing against her, where instead of allowing her to come in and surrender, they concocted this absurd scheme where they went to New York City to arrest her, where they've alerted the media, where they have this media sideshow where she is embarrassed, she's humiliated, she's put on national TV, international TV for that matter. I recognize this. And she's made to look ridiculous, and for what? And then she's taken to Rikers Island in New York in a Dickensian hellhole, if you will. And what does the LAPD do then? Singular in my experience, singular in my 43 years, LAPD goes on Good Morning America to talk about how they've arrested this guilty U.S. Open tennis referee. They're not doing it by the book. We call that malice. That's what we would like to prove in district court, that they were malicious toward Mrs. Goodman, that they didn't have probable cause, they were malicious. And the malice continues to this day. She's got a tiny little insurance policy, a $20,000 policy. Every time she's tried to collect on it, LAPD, this petite fellow, has told the insurance company, we're still investigating, she's still a suspect, don't give her her $20,000. We think that is malicious. We would like to prove that below. Thank you very much. Thank you all for your arguments today. The matter of Lois Goodman versus the City of Los Angeles Police Department will be submitted.
judges: Schroeder, Pregerson, Murguia